1
2
3
4
5
6                        UNITED STATES DISTRICT COURT

7                              DISTRICT OF NEVADA

8                                    * * *

9    JAYNES CORPORATION,                    Case No. 2:10-cv-00764-MMD-GWF

10                          Plaintiff,
                                                          ORDER
11        v.
                                            (Plf.'s Motion for Summary Judgment or
12   AMERICAN SAFETY INDEMNITY              Partial Summary Judgment – dkt. no. 29)
     COMPANY, et al.,
13                                              (Defs.' Motion for Summary
                          Defendants.             Judgment – dkt. no. 38)
14

15

16        Before the Court are the parties' cross-Motions for Summary Judgment.   (Dkt.

17   nos. 29 & 38.)

18   **I.    BACKGROUND**

19        On or about January 10, 2003, subcontractor Stewart & Sundell Concrete ("S&S")

20   entered into a written contract with general contractor Jaynes Corporation ("Jaynes") for

21   site concrete work at phases 1 and 2 of the Sun City Anthem ("SCA") residential housing

22   project in Henderson, Nevada.   The project was to construct sidewalks, curbs, valley

23   gutters, and sidewalk gravel in the SCA community.   The project owner was Del Webb

24   Communities, Inc. ("Del Webb").

25        S&S's work on the SCA project was performed in 2003 and 2004.   Pursuant to its

26   contract with Jaynes, S&S furnished all labor, material, and equipment to complete the

27   site concrete portion of the project, including sidewalks, curbs (roll curbs, L curbs, and A

28   curbs), valley gutters, and sidewalk gravel.

S&S agreed to name Jaynes as an additional insured under liability policies issued to S&S by American Safety Indemnity Company ("ASIC").[1] (*See* dkt. no. 34-13 at 23.) ASIC issued four commercial general liability ("CGL") policies to S&S ("the Policies"):

- policy no. ESL001216-02-01 (effective 03/01/2002 to 03/01/2003);
- policy no. ESL001216-03-02 (effective 03/01/2003 to 03/01/2004);
- policy no. ESL001216-04-03 (effective 03/01/2004 to 03/01/2005); and
- policy no. ESL001216-05-04 (effective 03/01/2005 to 03/01/2006).

Jaynes was named as a third party defendant in Nevada Revised Statutes Chapter 40 proceedings and a subsequent lawsuit in state court, *Sun City Anthem Community Association v. Del Webb Communities*. There, plaintiff SCA alleged that its residential community had sustained property damage from defective construction.

SCA's damages are alleged to have occurred during the policy periods. The Policies generally provide defense and indemnification liability coverage, with "each occurrence" limits of $1 million, subject to the terms, conditions, and exclusions stated therein. The Policies require ASIC to defend the insured against any "suit" seeking damages because of "property damage" if the "property damage" is caused by an "occurrence" and occurs during the policy period and is otherwise covered. The ASIC policies contain an "additional insured endorsement" ("AIE") provision. A primary issue disputed in the parties' Motions is whether Jaynes is covered under the AIE provision.

Jaynes tendered its defense of the state court action to its insurer, American Contractors Insurance Group ("ACIG"), which accepted Jaynes' tender. Jaynes tendered its defense to ASIC in October 2008. ASIC declined the tender. Jaynes asserts that as a result, it has incurred $106,760 in defense costs. The underlying litigation is currently pending before Eighth Judicial District Court.

---

[1]ASIC is a non-admitted insurer not licensed to do business in Nevada. In 2002 and thereafter, ASIC's surplus lines broker in Nevada, through which ASIC conducted insurance business with respect to its S&S account, was Sterling West Insurance Services, now known as CRC Insurance Services.

1    Because ASIC denied Jaynes coverage under S&S's CGL Policies, Jaynes filed

2    this case on May 24, 2010.  Jaynes asks the Court to declare that ASIC owes Jaynes a

3    duty to defend it in the *Sun City Anthem* litigation. Jaynes also alleges that ASIC

4    breached the Policies by failing to defend Jaynes thus far in the underlying litigation, and

5    seeks damages for the attorney fees and costs Jaynes has personally paid in that suit.

6    The parties both move for summary judgment.  While Jaynes argues that ASIC must

7    defend it under the Policy, ASIC contends that Jaynes was not an additional insured

8    under the Policies, and that several provisions of the CGL Policies provide that ASIC

9    does not owe Jaynes a duty to defend.

10   **II.     DISCUSSION**

11           **A.     Legal Standard**

12           The purpose of summary judgment is to avoid unnecessary trials when there is no

13   dispute as to the facts before the court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

14   F.3d 1468, 1471 (9th Cir. 1994).  Summary judgment is appropriate when the pleadings,

15   the discovery and disclosure materials on file, and any affidavits "show there is no

16   genuine issue as to any material fact and that the movant is entitled to judgment as a

17   matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine"

18   if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for

19   the nonmoving party and a dispute is "material" if it could affect the outcome of the suit

20   under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

21   Where reasonable minds could differ on the material facts at issue, however, summary

22   judgment is not appropriate.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

23   1995).  "The amount of evidence necessary to raise a genuine issue of material fact is

24   enough 'to require a jury or judge to resolve the parties' differing versions of the truth at

25   trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l

26   Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).  In evaluating a summary

27   judgment motion, a court views all facts and draws all inferences in the light most

28   ///

1  favorable to the nonmoving party.  *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793

2  F.2d 1100, 1103 (9th Cir. 1986).

3       The moving party bears the burden of showing that there are no genuine issues

4  of material fact.  *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In

5  order to carry its burden of production, the moving party must either produce evidence

6  negating an essential element of the nonmoving party's claim or defense or show that

7  the nonmoving party does not have enough evidence of an essential element to carry its

8  ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

9  F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements,

10  the burden shifts to the party resisting the motion to "set forth specific facts showing that

11  there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  The nonmoving party "may

12  not rely on denials in the pleadings but must produce specific evidence, through

13  affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME*

14  *Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show

15  that there is some metaphysical doubt as to the material facts."  *Orr v. Bank of Am.*, 285

16  F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).  "The mere existence of a

17  scintilla of evidence in support of the plaintiff's position will be insufficient."  *Anderson*,

18  477 U.S. at 252.

19       Further, "when parties submit cross-motions for summary judgment, '[e]ach

20  motion must be considered on its own merits.'"  *Fair Hous. Council of Riverside Cnty.,*

21  *Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W.

22  Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D.

23  441, 499 (Feb. 1992) (citations omitted)).  "In fulfilling its duty to review each cross-

24  motion separately, the court must review the evidence submitted in support of each

25  cross-motion."  *Id.*

26       **B.    Standing**

27       ASIC claims that ACIG has paid Jaynes' defense costs and Jaynes therefore

28  lacks standing to pursue its claim for recovery of the defense costs it has incurred in

connection with the underlying lawsuit, because ACIG is the real party in interest.  *See Valley Power Co. v. Toiyabe Supply Co.*, 396 P.2d 137, 138 (Nev. 1964) (an insurer who pays its insured in full for its claimed losses is the sole party in interest to assert a claim against others who may be ultimately liable.).

Jaynes informs the Court that this is not the case. Rather, under its Funded Deductible Policy with ACIG, Jaynes pays anticipated claim expenses in advance by way of high premium, and ACIG then refunds amounts later that are not used to pay claims or collects additional amounts if the costs exceed the $500,000 retention ($250,000 per occurrence for loss and $250,000 per occurrence for 'allocated loss adjustment expense').  Accordingly, Jaynes submits that its defense in the underlying action was paid by ACIG with Jaynes' own money, and that Jaynes will always be responsible for its defense costs up to $500,000 of its $1,000,000 deductible.

In response, ASIC informs the Court that Jaynes has previously represented under oath that ACIG paid the fees and costs to defend Jaynes in the underlying action in full.  ASIC argues that Jaynes cannot now create an issue of fact by submitting an affidavit contradicting previously-sworn testimony.

"The Supreme Court has explained that '[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.'"  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)) (internal quotation marks omitted).  "Some form of the sham affidavit rule is necessary to maintain this principle."  *Van Asdale*, 577 F.3d at 998.  "This is because . . . if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Id.* (citations and quotation marks omitted).

///

1    "At the same time, however, it must be recognized that the sham affidavit rule is in

2    tension with the principle that a court's role in deciding a summary judgment motion is

3    not to make credibility determinations or weigh conflicting evidence." *Van Asdale*, 577

4    F.3d at 998.  "Aggressive invocation of the rule also threatens to ensnare parties who

5    may have simply been confused during their deposition testimony and may encourage

6    gamesmanship by opposing attorneys.  We have thus recognized that the sham affidavit

7    rule 'should be applied with caution.'"  *Id.* (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5

8    F.3d 1255, 1264 (9th Cir.1993)); *see also Nelson v. City of Davis*, 571 F.3d 924 (9th Cir.

9    2009).

10    ASIC points to three documents where a Jaynes representative purportedly stated

11    that ACIG paid all of Jaynes' defense costs. Exhibit F, Jaynes' response to case

12    management questionnaire in the underlying action, states that ACIG is Jaynes' insurer

13    and was defending ACIG without a reservation of rights in *Sun City Anthem v. Del Webb*.

14    (Dkt. no. 38-7 at 3-4.)  However, that document contains significant disclaimer language,

15    stating that "[t]he responses contained herein . . . should in no way serve as a prejudice

16    to responding party in relation to additional discovery, research, or analysis." (*Id.* at 3.)

17    On review, the other two documents cited by ASIC also do not support its position.  (*See*

18    dkt. nos. 38-6; 38-11 at ¶ 11.)  On the other hand, Jaynes provides affidavit testimony of

19    ACIG's Vice President of Underwriting, Micah Bellow, stating that Jaynes, and not ACIG,

20    has paid for its defense in the underlying action, and that ACIG will not reimburse Jaynes

21    for those expenses.  (Dkt. no. 49 at page 6, ¶ 6.)

22    Therefore, the Court is faced with two conflicting assertions regarding whether

23    Jaynes or ACIG paid for Jaynes' defense costs in the underlying action. Jaynes provides

24    evidence in the form of a sworn affidavit stating that Jaynes is paying its own litigation

25    costs.  ASIC provides no evidence to the contrary.  The Court determines that there is no

26    genuine issue of material fact on this issue.  ACIG is not paying Jaynes' defense costs.[2]

27    _____

28    [2]ASIC's arguments regarding lack of ripeness and lack of damages are both premised on the factual assertion that ACIG paid for Jaynes' defense in the underlying (*fn. cont…*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.   Duplicative Litigation

ASIC contends that Jaynes' request for declaratory relief is duplicative of ASIC's breach of contract claim, as it essentially requests that the Court declare that ASIC is breaching its contractual obligation to Jaynes.  Count 1 of Jaynes' Complaint "requests a declaration from this Court that [P]laintiff is entitled to defense coverage under the ASIC policies with respect to the *Sun City* proceedings."  (Dkt. no. 1 at ¶ 14.)  Count 2 alleges breach of contract, and states that "Defendant breached the terms and conditions of the ASIC policies by failing to provide a defense to [P]laintiff in the *Sun City* proceedings." (*Id.* at ¶ 16.)

Jaynes differentiates between its two claims by stating that while the "declaratory relief claim seeks a declaration that ASIC has a duty to defend going forward . . .  the breach [of contract allegations] . . . seek damages based on ASIC's past wrongful conduct[.]"  (Dkt. no. 50 at 8.)  The Court agrees with Jaynes.

"Under 28 U.S.C. § 2201, 'any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *StreamCast Networks, Inc. v. IBIS LLC*, No. CV05-04239, 2006 WL 5720345, at *3 (C.D. Cal. May 2, 2006).  "Declaratory relief is designed to resolve uncertainties or disputes that may result in future litigation.  It operates prospectively and is not intended to redress past wrongs."  *Id.* (citing *United States v. Washington*, 759 F.2d 1353, 1356-57 (9th Cir.) (en banc) ("Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties") (other citations omitted)). However, "[t]he availability of other adequate remedies may make declaratory relief inappropriate . . . . Various courts have held, for example, that,

---

*(…fn. cont.)*
action.  As the Court has determined that Jaynes paid its own costs in the SCA litigation, ACIG's Motion for Summary Judgment cannot be granted on either of these two grounds.

1  [w]here determination of [a] breach of contract claim [will] resolve any question regarding

2  interpretation of the contract, there is no need for declaratory relief, and dismissal of a

3  companion declaratory relief claim is appropriate." *Id.* at 4 (quotation marks and citations

4  omitted).

5      "Declaratory relief is appropriate, however, where a breach of contract claim will

6  not settle all of the contractual issues concerning which plaintiff seeks declaratory relief."

7  *StreamCast*, 2006 WL 5720345, at *4 (citations omitted). For example, in *Sierra Foothills*

8  *Public Utility Dist. v. Clarendon America Ins. Co.*, No. CVF05736, 2005 WL 2089832, at

9  *6-7 (E. D. Cal. Aug. 29, 2005), a case concerning an insurer's duty to defend, the first

10  cause of action alleged breach of contract while the fourth cause of action sought a

11  declaration that the defendant's policy would provide the plaintiff coverage and

12  indemnification in the underlying litigation.  The defendant argued that the causes of

13  action were duplicative.  *Id.*  The court held that "because of the potentially continuing

14  duty to defend on the appeal or thereafter if a re-trial is ordered, the court does not view

15  the Fourth Cause of Action as serving no useful purpose. The court is not faced with a

16  situation in which the underlying litigation is final and the insured is merely seeking

17  damages from the insurer because of the refusal to defend and indemnify.

18  Consequently, the court concludes that the Fourth Cause of Action will not be dismissed

19  as duplicative." *Id.* at *6.

20      Like in *Sierra Foothills*, there is an ongoing duty to defend here, as the *Sun City*

21  litigation is ongoing.  *See* 2005 WL 2089832 at *6-7. Therefore, Jaynes' allegation that

22  ASIC breached its contractual obligations is not duplicative of its request for declaratory

23  relief stating that ASIC must defend Jaynes in the *Sun City* litigation.[3]

24  ///

25

26      [3]However, to the extent that Jaynes requests declaratory relief stating that ASIC
   breached its contractual duty to defend Jaynes (*see* dkt. no. 29 at 2(3)), that request is

27  duplicative and is therefore denied.  The Court construes Jaynes' request for declaratory
   relief as asking the Court to declare that ASIC must defend Jaynes in the underlying

28  litigation.

1    Finally, ASIC argues that because Jaynes has sued S&S and others for the same
2    alleged damages in the underlying action, the present action is duplicative.  However,
3    Jaynes informs the Court that its declaratory relief claims against S&S and other sub-
4    contractors concern Jaynes' rights under its contracts with those entities, not under the
5    ASIC policies.  This is sufficient to defeat summary judgment on this claim.

6    Jaynes' causes of action are not duplicative. The Court declines to grant summary
7    judgment on Jaynes' declaratory relief cause of action.

8        **D.    ASIC's Duty to Defend**

9    The Court next considers whether ASIC owed and continues to owe Jaynes a
10   duty to defend. The Court considers four policy provisions which could obviate ASIC's
11   duty to defend.  First, the Court must determine whether Jaynes is an additional insured
12   ("AI") under the Additional Insured Entity provision of S&S' insurance contract.  Second,
13   the Court must determine whether the "ongoing operations" provisions in the ASIC
14   insurance contract preclude Jaynes from coverage under the policy. Third, the Court
15   must determine whether the work product exclusions preclude coverage for S&S's work
16   on the SCA project.  Finally, the Court must determine whether the "sole negligence"
17   provision precludes coverage under the policy.

18   The Court determines that Jaynes is an AI under the AIE provision in S&S's
19   contract. Further, none of the additional contractual provisions discussed by ASIC
20   exempt it from defending Jaynes in the underlying litigation.  Therefore, because S&S's
21   insurance policy contains a provision covering an additional insured, and it is undisputed
22   that in S&S and Jaynes' contract, S&S agreed to list Jaynes as an AI in its insurance
23   policies, ASIC owed, and continues to owe, Jaynes a duty to defend.

24   ///
25   ///
26   ///
27   ///
28   ///

1    **1.    Nevada Insurance Law[4]**

2    Generally, "interpretation of an insurance policy is a question of law." *Waller v.*

3  *Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). "Insurance policies are contracts to which

4  ordinary rules of contractual interpretation apply." *Maryland Casualty Co. v. Nationwide*

5  *Ins. Co.,* 65 Cal. App. 4th 21, 28 (1998). The court should "look first to the language of

6  the contract in order to ascertain its plain meaning . . . ." *Waller,* 11 Cal. 4th at 18. "A

7  policy provision is ambiguous when it is capable of two or more constructions both of

8  which are reasonable." *Id.* (quotations omitted). "Any ambiguous terms are resolved in

9  the insureds' favor, consistent with the insureds' reasonable expectations." *Kazi v. State*

10  *Farm Fire and Cas. Co.*, 24 Cal. 4th 871, 879 (2001).

11    "An insurer must defend any action that asserts a claim potentially seeking

12  damages within the coverage of the policy." *Maryland Casualty Co.*, 65 Cal. App. 4th at

13  32 (quoting *Montrose Chemical Corp. v. Super. Ct.*, 6 Cal. 4th 287, 295 n.3 (1993)); *see*

14  *also Buss v. Sup. Court*, 16 Cal. 4th 35, 46 n.10 (1997) (holding that the duty to defend

15  is dependent on "at least potential coverage."). "[T]he duty to defend may exist even

16  where coverage is in doubt and ultimately does not develop . . . ." *Kazi*, 24 Cal. 4th at

17  879; *see also Quan v. Truck Ins. Exch.*, 67 Cal. App. 4th 583 (1998). "[F]or an insurer,

18  the existence of a duty to defend turns not upon the ultimate adjudication of coverage

19  under its policy of insurance, but upon those facts known by the insurer at the inception

20  of a third party lawsuit." *Montrose*, 4 Cal. 4th at 295 (internal citations and quotations

21  omitted).

22    "[T]he duty to defend, although broad, is not unlimited; it is measured by the

23  nature and kinds of risks covered by the policy." *Waller,* 11 Cal. 4th at 19. "[W]here

24  there is no potential for coverage, there is no duty to defend." *Infinet Mktg. Servs., Inc.*

25  *v. Am. Motorist Ins. Co.*, 150 Cal. App. 4th 168, 177 (2007); *see also Hudson Ins. Co. v.*

26    ———————————

27    [4]"In the context of interpreting insurance policy terms, the Nevada Supreme Court has often looked to persuasive precedent from other jurisdictions, especially California." *Zurich Am. Ins. Co. v. Coeur Rochester, Inc.*, 720 F. Supp. 2d 1223, 1235 (D. Nev.

28  2010).

1  *Colony Ins. Co.*, 624 F.3d 1264, 1268 (9th Cir. 2010) (holding that the duty to defend

2  does not exist where there is no legal theory or facts in the underlying complaint to

3  potentially give rise to coverage) (citing *Gunderson v. Fire Insurance Exch.*, 37 Cal. App.

4  4th 1106, 44 (1995)).

5      Accordingly, "[i]n resolving the question of whether a duty to defend exists . . . the

6  insurer has a higher burden than the insured." *Am. States Ins. Co. v. Progressive Cas.*

7  *Ins. Co.*, 180 Cal. App. 4th 18, 27 (2009). "The insured need only show that the

8  underlying claim may fall within policy coverage; the insurer must prove it cannot; the

9  insurer, in other words, must present undisputed facts that eliminate any possibility of

10  coverage." *Id.* (emphasis and citations omitted).

11  **2.    Additional Insured Endorsement Provision**

12      Jaynes claims that it was an AI under the AIE provision in S&S's contract with

13  ASIC, and that ASIC therefore owed, and continues to owe, Jaynes a duty to defend in

14  the underlying litigation. ASIC, however, claims that it never consented to adding Jaynes

15  as an additional insured under S&S' policy. Rather, the insurer's underwriting

16  department has a "practice" of requiring written consent before insuring an AI, and ASIC

17  did not give written consent to insuring Jaynes here.[5]

18      The ES 98 15 form provides:

19                      **ASIC – ES 98 15 08 99**

20                        **(MODIFIED FORM B)**

21      This Endorsement shall not serve to increase our limits of insurance, as
        described in SECTION III – LIMITS OF INSURANCE.
22

23      **Name of Person or Organization:** Those parties required to be named
        as an Additional Insured in a written contract with the Named Insured
        entered into prior to the loss of occurrence.[6]
24
_____

25      [5]ASIC argues that the existence of two AIEs issued to unrelated parties is
   evidence that its AIE policy contains a written consent requirement.  The Court agrees
26  with Jaynes that "whether ASIC issued those entities separate . . . [AIEs] . . . may or
   may not be evidence of ASIC's underwriting policy, but it has no bearing whatsoever on
27  the actual language of the AIEs at issue."  (Dkt. no. 44 at 7.)

       [6]The parties do not dispute that S&S's contract with Jaynes satisfies this
28  contractual prerequisite.

**Name of Project:** Those projects on file with Company.

**Effective Date:**          March 01, 2002

In Consideration of the payment of premiums, it is hereby agreed that the following changes are incorporated into the policy:

WHO IS AN INSURED (SECTION II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" which is performed at the project designated above.  This Endorsement applies only to ongoing operations performed by the Named Insured on or after the effective date of this Endorsement.

Coverage under this Endorsement applies only as respects a legally enforceable written contract with the Named Insured and only for liability arising out of or relating to the Named Insured's sole negligence and only for bodily injury or property damage caused by an occurrence under coverage A not otherwise excluded in the policy to which this Endorsement applies.

It is further understood and agreed that irrespective of the number of entities named as insureds under this policy in no event shall the Company's limits of liability exceed the limits of liability designated in the Declarations.

All other terms, conditions, and exclusions under the policy are applicable to this Endorsement and remain unchanged.

Jaynes first argues that the "projects on file" provision is "utterly ambiguous" (dkt. no. 29 at 16), because it is not defined in the policy and no explanation of its intended meaning can be inferred from the other policy language.

Assuming *arguendo* that the "projects on file" provision is enforceable, the Court determines that the SCA project was on file with ASIC.  In *D.R. Horton Los Angeles Holding Co., Inc. v. American Safety Indemnity Co.*, No. 10CV443 WQH WMC, 2012 WL 33070, at *9-10 (S.D. Cal. Jan. 5, 2012), the court held that the very same "projects on file" provision was satisfied in a similar factual scenario. There, like here, ASIC's insured, the subcontractor, had a contract with D.R. Horton, the general contractor, requiring the subcontractor to name D.R. Horton as an additional insured under the insurance.  *Id.* at *10. The court determined that because (1) the subcontractor agreement required plaintiff general contractor to be named as an AI and (2) plaintiff submitted a Waiver of Subrogation form listing plaintiff and the building project to ASIC's broker, there was at

1  the very least a factual dispute regarding whether "projects on file" requirement was

2  satisfied.  *Id.* Accordingly, the court held that there was a potential for coverage and

3  ASIC had a duty to defend the plaintiff as an additional insured pursuant to the 98 15

4  endorsements.  *Id.*

5       The Court determines that there was at the very least a factual dispute regarding

6  whether the Sun City Anthem project was "on file" with ASIC, thereby triggering its duty

7  to defend Jaynes.  Jaynes submits Certificates of Insurance as evidence that the SCA

8  project was "on file" with ASIC.  The Certificates state, in relevant part, that Jaynes is an

9  additional insured with respect to the "Sun City Anthem Unit 22 Phase 1 & 2" job per "the

10  attached ASIC ES9815," which is the 98 15 policy reproduced above.  (Dkt. nos. 34-14

11  at 2; 34-15 at 2; 34-16 at 2; 34-17 at 2; 34-18 at 2.)

12       Lou Landini of Landini & Associates, Ltd., the local insurance agency for S&S

13  until January 2003, testified that S&S requested Landini issue a Certificate of Insurance

14  to Jaynes to demonstrate that S&S possessed the necessary insurance to enter into a

15  subcontract with Jaynes for work on the Sun City Anthem project in Henderson, Nevada,

16  and to show that Jaynes was an additional insured under S&S's policy.  (Dkt. no. 35 at

17  ¶¶ 1, 7.)  Landini testified that the agency issued the certificate as requested on

18  December 11, 2002, and that the Certificate identifies the "Certificate Holder and Owner"

19  as additional insureds and specifically identifies the project as "Sun City Anthem Unit 22

20  Phases 1 and 2." (*Id.* at ¶ 9.)  Wade Leavitt, co-owner of Leavitt Insurance Agency, the

21  local insurance agent for S&S from 2003 onwards, testified that it issued essentially the

22  same Certificate to Jaynes on February 28, 2003, March 5, 2003, and December 29,

23  2003.[7]  (Dkt. no. 33 at ¶¶ 1, 3, 9, 10.)

24  _____

25  [7]Defendant objects to the admissibility of the Landini and Leavitt affidavits on five
    grounds (dkt. no. 38): (1) the affidavits are not properly authenticated under Fed. R.
    Evid. 901; (2) the affiants lack sufficient personal knowledge; (3) the affidavits are
26  misleading because they do not explain that the Certificates of Insurance were
    accompanied by disclaimers starting that the Certificates do not constitute a contract
27  between the insurer and the certificate holder and does not extend or alter coverage
    afforded to Jaynes; (4) the affidavits are hearsay (*see* Fed. R. Evid. 802); and (5) the
28  affidavits violate NRS § 685A.010.
    (*fn. cont…*)

1      Both Leavitt and Landini testified that although their companies no longer contain

2   documentary evidence showing that the Certificates were forwarded to Sterling West, it

3   was their standard practice to send the Certificates of Insurance to the insurance carrier

4   or the carrier's surplus lines broker in the case of non-admitted carriers.  (Dkt. nos. 35 at

5   ¶¶ 10-11, 32 at ¶¶ 10-11.)

6      ASIC does not deny that it, or Sterling West, received the Certificates.  Rather,

7   ASIC argues that it had a policy endorsement with Sterling West stating that the broker

8   could not "accept, review or maintain files of ay certificates of insurance or additional

9   insured endorsements relating to any policy issued by any company [ASIC] represent[s]

10  unless such certificates of insurance or endorsements relate to an endorsement issued

11  by [ASIC] pursuant to a written policy change request."  (Dkt. no. 39-14 at 2.)  However,

12  this amendment to the producer/broker agreement was signed on July 13, 2004, while

13  the Certificates were issued and sent to Sterling West in 2002 and 2003.  (*See id.*)

14  Further, ASIC sent Sterling West a letter explaining that the 2004 language constituted

15  an *amendment* to ASIC's previous policy regarding Certificates of Insurance, stating in

16  part that ASIC "will no longer accept or maintain Certificates in our *offices as we have*

17  *done in the past.*"  (Dkt. no. 34-12 at 6; emphasis added.)  This strongly militates against

18  ASIC having a prior policy against accepting Certificates.  The policy amendment cited to

19  by ASIC is therefore immaterial.

20     The Certificates of Insurance, coupled with Landini and Leavitt's testimonies,

21  demonstrate that ASIC was aware of the SCA project and Jaynes' involvement therein.

22

---

23  *(…fn. cont.)*

    The Court overrules the objections. The affiants state that they testified to
24  information within their personal knowledge, and described how they came to know the
    information testified to in the scope of their employment. The evidence satisfies
25  Evidence Rules 602 and 901(b)(1). The affiants have not misstated the evidence as
    Plaintiff attached the Certificates, *with the disclaimer language*, to their pleadings. *See*
26  Fed. R. Evid. 1002, 1003. The Certificates fall under the Fed. R. Evid. 803(6) hearsay
    exception, because they are records of a regularly conducted business activity made at
27  or near the time of the activity by persons with knowledge. Finally, whether the
    Certificates violate NRS § 685A.080 has absolutely no bearing on whether or not ASIC
28  had the SCA project on file.

As the "projects on file" requirement is undefined, and ambiguities in insurance policies must be determined in favor of the insured, the Court determines that the SCA project was "on file" with ASIC.  *See Am. States Ins. Co.*, 180 Cal. App. 4th at 27.

Because the Court determines that the SCA project was "on file" with ASIC, the Court determines that ASIC had a duty to defend Jaynes as an AI under the 98 15 policy.  *Accord D.R. Horton*, 2012 WL 33070, at *10.

### 3.    Ongoing Operations Provision

ASIC next argues that its "ongoing operations" provision precludes coverage for the construction defect claims in the underlying lawsuit because these claims involve completed operations.  By way of reminder, the ES 98 15 policy states, in relevant part:

> WHO IS AN INSURED (SECTION II) is amended to include as an insured the person or organization shown in the Schedule, <u>but only with respect to liability arising out of "your work" which is performed at the project designated above.  This Endorsement applies only to ongoing operations performed by the Named Insured on or after the effective date of this Endorsement.</u>

(Emphasis added.)  ASIC, citing *Pardee Construction Co. v. Insurance Co. of the West*, 77 Cal. App. 4th 1340, 1356 (2000), argues that construction defect claims such as those alleged in *Sun City Anthem* inherently involve completed work, not works in progress.

Jaynes argues that the "ongoing operations" provision does not restrict coverage to property damage that occurred *during* the ongoing operations, but also covers claims for damage that occurred after the operation but was *caused by* ongoing operations.

The Court agrees with Jaynes, and determines that the "ongoing operations" clause applies to damage on work performed by S&S caused by its ongoing operations.  In both *Tri-Star Theme Builders, Inc. v. OneBeacon Insurance Co.*, 426 F. App'x 506, 510-512 (9th Cir. 2011)[8] and *McMillin Construction Services, L.P. v. Arch Specialty*

---

[8]Pursuant to 9th Circuit Rule 36-3, *Tri-Star* is not precedent, but may be cited by this Court. *See also* FRAP 32.1. The Court accordingly cites *Tri-Star* not for its precedential value, but because it finds the 9th Circuit's reasoning on a near-identical contract term persuasive.

1   *Insurance Co.*, No. 10CV2592, 2012 WL 243321, at *2-3 (S.D. Cal. Jan. 25, 2012),

2   courts determined that similar policies covered liability performed by the subcontractor

3   caused by the subcontractor's ongoing operations.[9]   In both cases, the "arising out of"

4   language in the "ongoing operations" clause was central to the courts' determinations.

5   *See id.* The *Tri-Star* court stated that "construing the words 'ongoing operations' to

6   exclude damage that arose from conduct performed by [the subcontractor] *while its*

7   *operations were ongoing* requires a parsing so abstruse as to be inconsistent with 'what

8   the ordinary person's understanding of the policy would be.'" 426 F. App'x at 511

9   (emphasis in original).

10      Like the Arizona and California insurance law at issue in *Tri-Star* and *McMillan*,

11   respectively, Nevada courts judge insurance policy terms "from the perspective of one

12   not trained in law or in insurance, with the terms of the contract viewed in their plain,

13   ordinary and popular sense."  *Allstate Ins. Co. v. Sanders*, 495 F. Supp. 2d 1104, 1106

14   (D. Nev. 2007) (citations omitted)).  ASIC attempts to distinguish *Tri-Star* by stating that

15   the "ongoing operations" provision at issue there is "clearly" not the same language in

16   the ASIC AIE. ASIC is incorrect; the AIE language in *Tri-Star* is nearly identical, and

17   provided for coverage

18      "only with respect to liability arising out of . . . [Golden West's] ongoing
    operations performed for . . . [Tri-Star] on the Project . . ., and only to the
19      extent of liability resulting from occurrences arising out of . . . [Golden
    West's] negligence."
20

21   (Dkt. no. 54 at 10.)  The key provision in *TriStar* is substantially similar to the "arising

22   of language here.   There, the court held that

23      [t]he key phrase–"arising out of the Named Insured's ongoing operations"
    (which is not defined)–addresses only the type of activity (ongoing
24

25      [9]*Tri-Star* involved Arizona insurance law; *McMillan* involved California insurance
    law.  The *McMillan* court adopted the *Tri-Star* holding, noting that Arizona and California
26   law are in agreement in how they interpret ambiguous clauses to insurance contracts.
    2012 WL 243321, at *3.  *Accord Seminis, Inc. v. Factory Mut. Ins. Co.*, 802 F. Supp. 2d
27   1097, 1101-02 (C.D. Cal. 2008) (noting that under California insurance law, "[w]ords in
    an insurance policy are ordinarily to be interpreted as a layperson would interpret them,
28   that is, in their ordinary and popular sense.").

16

1
2
3
4
5

> operations) from which the . . . [additional insured's] liability must arise in order to be covered, not when the injury or damage must occur.  In other words, this language does not state that injury must occur, or liability must arise, *during* the Name Insured's ongoing operations, but rather requires only that the liability arise "*out of*" the ongoing operations, which may require only a minimal causal connection between the liability and the "ongoing operations."  . . . At the very least, there is an argument that the endorsement's undefined language is ambiguous and should be construed against the drafter.

6    *Tri-Star*, 426 F. App'x at 510 (emphasis in original). Similarly, in this case the AIE

7    provision covers only "liability arising out of [S&S's] work" performed at designated

8    projects (referencing the "projects on file" provision discussed *supra*), and only to

9    "ongoing operations performed by [S&S] on or after the effective date [of the contract]."

10   ASIC's argument that the two policies are substantively different is both misleading and

11   patently wrong.  In fact, to construe the plain language of a contractual provision as

12   ASIC desires – that an AI's coverage for liability *arising out of* a subcontractor's ongoing

13   operations is restricted to coverage for damages occurring *during* the subcontractor's

14   operations – would be so counterintuitive as to be absurd, and would render the "arising

15   out of" clause needless surplusage. The sound principles of contract interpretation

16   dictate that the Court must follow Jaynes' far more rational interpretation.   *See Flagship*

17   *W., LLC v. Excel Realty Partners, L.P.*, 758 F. Supp. 2d 1004, 1012 (E.D. Cal. 2010),

18   ("Interpretation of a contract must be fair and reasonable, not leading to absurd

19   conclusions") (internal quotation marks and citation omitted)); *United States v. 1.377*

20   *Acres of Land, More or Less, situated in City of San Diego, County of San Diego, State*

21   *of Cal.*, 352 F.3d 1259, 1265 (9th Cir. 2003) ("Courts interpreting the language of

22   contracts should give effect to every provision, and an interpretation which renders part

23   of the instrument to be surplusage should be avoided.") (internal quotation marks and

24   citation omitted)).

25        Finally, the Court notes that in light of *McMillan* and *Tri-Star*, it is unpersuaded by

26   the contrary case law cited by ASIC.  Rather, on review, this Court agrees with the *Tri-*

27   *Star* court that "the cases that have limited coverage of the additional insured

28   endorsement to damages occurring during the named insured's ongoing operations

1  have not relied on the plain language of the clause.  Instead, they have drawn inferences

2  regarding the scope of coverage by relying on the drafting history of the clause by the

3  insurance company."  426 F. App'x at 510 (*referencing Hartford Ins. Co. v. Ohio Cas.*

4  *Ins. Co.*, 189 P.3d 195, 201-02 (Wash. App.2008); *Weitz Co., LLC v. Mid-Century Ins.*

5  *Co.*, 181 P.3d 309, 312-15 (Colo. Ct. App. 2007); *Pardee Const. Co. v. Ins. Co. of the*

6  *W.*, 77 Cal. App. 4th 1340, 1358-60 (2000)).  In fact, these cases reach their conclusions

7  that the "ongoing operations" clause limits AI coverage to damage taking place during a

8  subcontractor's operations only after tracing the development of ongoing operations

9  clauses in the insurance industry from the early 1990s onwards. *See Hartford Ins. Co. v.*

10  *Ohio Cas. Ins. Co.*, 189 P.3d 195, 201-02 (Wash. App.2008); *Weitz Co., LLC v. Mid-*

11  *Century Ins. Co.*, 181 P.3d 309, 312-15 (Colo. Ct. App. 2007); *Pardee Const. Co. v. Ins.*

12  *Co. of the W.*, 77 Cal. App. 4th 1340, 1358-60 (2000).  While this history lesson makes

13  for an interesting read, it is not persuasive in the face of the plain language of the

14  ongoing operations clause.   As the *Tri-Star* court noted, "[s]uch evidence might be

15  persuasive if the controversy . . . were between two insurers, or if it suggested that the

16  language reflected the mutual intent of the parties. This evidence is wholly lacking here.

17  Indeed, . . . the only court to construe the additional insured endorsement, without

18  reference to the industry's drafting history, held that it provided coverage for damages

19  occurring after the completion of operations."  426 F. App'x at 512 (quotation marks and

20  citations omitted).

### 4.    Work Product Exclusions

22         ASIC next argues that "[b]ased on the interplay of exclusion 2.j.(5) and 2.j.(6) in

23  the CG form 0001 07 98, there is no coverage for damages to the project itself while the

24  named insured's operations are ongoing." (Dkt. no. 39 at 24.)   Exclusion 2.(j).(5)

25  provides that "property damage" does not include injury to "[t]hat particular part of real

26  property on which you or any contractors or subcontractors working directly or indirectly

27  on your behalf are performing operations, if the 'property damage' arises out of those

28  operations."  Exclusion 2.(j).(6) provides that "property damage" does not include injury

to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your [your or you is S&S's] work' was incorrectly performed on it."  ASIC contends that "[t]he ASIC policies, like all typical Commercial Liability policies, do not cover damage to the project itself during ongoing operations of the Named Insured. Rather, coverage is triggered for *resulting damages* [only] by an exception to 2.j.(6) once the work is completed."  (*Id.*; emphasis added).

ASIC made the same argument in *D.R. Horton*.  There, the court determined that the underlying lawsuits alleged damage beyond repair and replacement of the subcontractor's work, and therefore the work product exclusions did not preclude coverage. 2012 WL 33070, at *15.   The court explained that "[t]he j(5) and j(6) exclusions 'preclude coverage for deficiencies in the insured's work.'" *Id.* (citing *Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Co. of Ariz.*, 193 Cal. App. 4th 1311, 1325 (2011) (explaining that defect and deficiencies in the insured's work would be excluded by j(5) and j(6)).  In fact, "[g]enerally, liability policies . . . are not designed to provide contractors and developers with coverage against claims *their work* is inferior or defective."  *D.R. Horton*, 2012 WL 33070 at *14 (citing *Maryland Casualty Co. v. Reeder*, 221 Cal. App. 3d 961, 967 (1990) (emphasis added by the *D.R. Horton* court)).  "Work product exclusions such as those contained in exclusions j(5) and j(6) exclude 'repair and replacement losses' and are intended to provide incentive to exercise care in workmanship thereby reducing the risk that is covered."  *D.R. Horton*, 2012 WL 33070 at *14 (citing *Western Employers Ins. Co. v. Arciero & Sons, Inc.*, 146 Cal. App. 3d 1027, 1031-32 (1983)).  Moreover "the effect of the policy is to make the contractor stand its own replacement and repair losses while the insurer takes the risk of injury to the property of others."  *D.R. Horton*, 2012 WL 33070 at *14 (citation omitted).  "The risk intended to be insured is the possibility that the work of the insured, once relinquished or completed, will cause bodily injury or damage to property *other than to the product or completed work itself.*"  *Id.* (citation, quotation marks, and ellipses omitted; emphasis in *D.R. Horton*.)

The Court determines that the allegations in the underlying lawsuit potentially allege damages falling outside the work product exclusions.  Plaintiffs in the *Sun City Anthem* state court litigation allege that a cracked concrete curb resulted in cracking and deterioration of adjacent hardscape and pavement; that a cracked concrete cross gutter resulted in cracking and deterioration of adjacent hardscape and pavement; that a cracked concrete manhole collar resulted in cracking and deterioration of adjacent hardscape; that a chipped concrete sidewalk resulted in cracking and deterioration of adjacent hardscape and pavements; that ponding on a rolled curb resulted in cracking and deterioration of adjacent pavement; that failed asphalt pavement resulted in cracking and deterioration of adjacent pavement; that spalled asphalt seal coat resulted in deterioration of pavement; and that inadequate drainage at retaining wall resulting in cracking and deterioration of masonry fence.[10] Each of these allegations potentially relate to S&S's finished work that caused bodily injury or property damage to property other than the concrete work S&S itself completed.  *See D.R. Horton*, 2012 WL 33070 at *14.

## 5.    Sole Negligence Provision

ASIC next argues that that because the claims in the underlying litigation are not derivative of S&S's sole negligence, but involve Del Webb and Jaynes' culpability, the "sole negligence" provision precludes coverage.  That provision states:

> Coverage under this Endorsement applies only as respects a legally enforceable written contract with the Named Insured <u>and only for liability arising out of or relating to the Named Insured's sole negligence</u> and only for bodily injury or property damage caused by an occurrence under coverage A not otherwise excluded in the policy to which this endorsement applies.

(Dkt. no. 39 at 27-28 (emphasis added).)  In the complaint, the *SCA* plaintiffs state that they are not fully aware of all of the causes of the property damage their homes

---

[10]These damages were all listed in a "preliminary list of deficiencies" filed in the underlying litigation.  (Dkt. no. 34-21 at 5.)  This document was filed on January 12, 2009 (*see id.*), while ASIC made its final decision to deny Jaynes a defense on September 23, 2009.

1    endured.  (Dkt. no. 34-41 at 5.)  The plaintiffs allege that the SCA development was not

2    properly designed, engineered, supervised, and/or constructed. (*Id.* at 10.) This, coupled

3    with the damages listed in a "preliminary list of deficiencies" (reproduced above in Part

4    II(D)(4)), demonstrate that a jury could potentially find that S&S's sole negligence on its

5    concrete work gave rise to the damage alleged in the underlying action.  *Accord D.R.*

6    *Horton*, 2012 WL 33070, at *18.  Jaynes need establish no more than this potential to

7    trigger the duty to defend.  *See Montrose*, 6 Cal. 4th at 300.

8         **E.    Self-Insured Retention Endorsement**

9         ASIC argues that even if it has an obligation to defend Jaynes, the Self-Insured

10    Retention (SIR) Endorsement precludes Jaynes from recovering the full $106,760 it

11    seeks in damages.  The SIR states:

12         Amount and Basis of Self Insured Retention

13         $10,000[11] per occurrence except $50,000 per occurrence for any
     condo/townhouse claims
14

15         Our obligation under the policy to pay damages or SUPPLEMENTARY
     PAYMENTS – COVERAGES A AND B to you or on your behalf applies
16         only to the amount of damages or SUPPLEMENTARY PAYMENTS –
     COVERAGES A AND B in excess of any self-insured retention amounts
17         stated in the Schedule above as applicable to such coverages, and the
     limits of insurance applicable to such coverages will not be reduced by the
18         amount of such self-insured retention.

19         As a condition precedent to our obligations to provide or continue to
     provide indemnity, coverage, or defense hereunder, the insured, upon
20         receipt of notice of any "suit," incident or "occurrence" that may give rise
     to a "suit", and at our request, shall pay over and deposit with us all or any
21         part of the self-insured retention amount as specified in the policy,
     requested by us, to be applied by us as payment toward any damages or
22         SUPPLEMENTARY PAYMENTS – COVERAGES A AND B incurred in the
     handling or settlement of any such incident, "occurrence" or "suit".

23

24         "Liability insurance policies [sic] often contain a 'deductible' or a 'self-insured

25    retention' (SIR) requiring the insured to bear a portion of a loss otherwise covered by the

26    policy."  *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal. App. 4th 1466, 1473-74

27    _____

28         [11]Jaynes submits that the SIR for occurrences other than condo/townhome claims
     is $5,000 in the first CGL policy (*see* dkt. no. 38-18 at 2.)

21

1    (2010).  "Policies subject to self-insured retentions are treated like excess policies: [i]t is

2    well recognized that self-insured retentions are the equivalent of primary insurance and

3    that policies which are subject to self-insurance retentions are 'excess policies' which

4    have no duty to indemnify [or defend] until the self-insured retention is exhausted."[12]

5    *Travelers Cas. & Sur. Co. v. Am. Int'l Surplus Lines Ins. Co.*, 465 F. Supp. 2d 1005,

6    1021 (S.D. Cal. 2006) (quotation marks and citations omitted).

7         Accordingly, Jaynes must subtract the amount specified in the SIR from its breach

8    of contract damages.  Jaynes argues that it need not provide ASIC with the SIR because

9    ASIC did not "request" the SIR.  However, Jaynes cites to no case law to support its

10   argument.  Further, the plain language of the SIR is clear: Jaynes must deposit the SIR

11   amount with ASIC before ASIC tenders its defense.  Here, ASIC previously refused to

12   defend Jaynes.  It must now defend Jaynes, however Jaynes' recovery for ASIC's past

13   failure to defend must be reduced by the amount owed to ASIC set forth in the SIR.

14   **III.   CONCLUSION**

15        The Court notes that the parties made several arguments and cited to several

16   cases not discussed above.  The Court has reviewed these arguments and cases and

17   determines that they do not warrant discussion as they do not affect the outcome of

18   these Motions.

19        IT IS ORDERED that Defendant ASIC's Motion for Summary Judgment (dkt. no.

20   38) is DENIED.

21        IT IS FURTHER ORDERED that Plaintiff Jaynes Corp.'s Motion for Summary

22   Judgment (dkt. no. 29) is GRANTED to the extent described below:

23        • ASIC had, and continues to have, a duty to defend Jaynes under the

24          Additional Insured Endorsement provision of S&S's insurance policies with

25

26        [12]Though similar to a deductible, "a deductible is distinguishable from a self-
     insured retention because unlike a deductible, the excess insurer's obligations do not
27   arise until after the amount of the self-insured retention has been paid."  *Nat'l Union Fire
     Ins. Co. of Pittsburgh, Pa. v. Lawyers' Mut. Ins. Co.*, 885 F. Supp. 202, 206 (S.D. Cal.
28   1995) (quotation marks and citation omitted).

ASIC.  The Court hereby declares that ASIC has a present duty to defend Jaynes in the underlying action, *Sun City Anthem Community Association v. Del Webb Communities*

- ASIC must also compensate Jaynes reasonable costs incurred in its defense of the underlying action, except for the amount which Jaynes must pay ASIC pursuant to the SIR.  The parties shall meet and confer to attempt to agree on the amount Jaynes owes ASIC under the SIR.   If the parties reach an agreement, they shall notify the Court and stipulate to voluntary dismissal of this action within thirty (30) days.  See Fed. R. Civ. P. 41(a)(1)(A)(ii). Alternatively, if either or both of the parties wish to appeal this Order, the parties may reach a conditional agreement with respect to the amount ASIC owes Jaynes and then move for judgment pursuant to Federal Rule of Civil Procedure 54(b) within thirty (30) days.  If the parties cannot agree on the amount of damages, they must file cross-motions for summary judgment on damages within thirty (30) days.

IT IS FURTHER ORDERED that Defendant's evidentiary objections (dkt. no. 40) not discussed above are overruled.

DATED THIS 26th day of December 2012.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE